## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, ex.
rel. RANDY S. SCHWARTZ,

        Plaintiffs,

      v.

TENET HEALTHCARE
CORPORATION, TENET HOME
CARE OF DELRAY MEDICAL
CENTER, and TENET SOUTH
FLORIDA HEALTHSYSTEM,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CIV - GOLD**

# 99-6668

Case No.

Magistrate Judge    **MAGISTRATE JUDGE
SIMONTON**

## COMPLAINT

**JURY DEMANDED**



1.    Plaintiffs, United States ex rel. Randy S. Schwartz individually, through their attorney, Robert Anthony Bogdan, and complaining of Defendants, Tenet Healthcare Corporation, Tenet Home Care of Delray Medical Center, and Tenet South Florida HealthSystem, for their complaint allege:

<u>JURISDICTION AND THE PARTIES</u>

2.    The plaintiff, Randy S. Schwartz, R.N., Q.R.M., (the "Relator"), resides at 839 Granada Drive, Boca Raton, Florida 33432-8115 and is a Registered Nurse and a QRM.

3.    The Defendant, Tenet Healthcare Corporation, upon information and belief is a corporation

authorized and doing business in the state of Florida and within this district.

4.      The Defendants, Tenet Home Care of Delray Medical Center and Tenet South Florida HealthSystem, upon information and belief, are subsidiaries or operating units of Tenet Healthcare Corporation.

5.      Upon information and belief, the Defendants are providing medical services and home health care services.

6.      This action is brought on behalf of the United States to recover all damages, penalties and other remedies established by and pursuant to 31 U.S.C.§§ 3729-3733, and Relator Randy S. Schwartz claims entitlement to a portion of any recovery obtained by the United States as qui tam plaintiff authorized by 31 U.S.C. § 3730.

7.      As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), the Relator is providing the Attorney General of the United States and the United States Attorney for the Southern District of Florida with a statement of all material evidence and information related to the complaint. This disclosure statement supports the existence of charging for improper claims and the reliance by the United States government on invoices for said improper claims.

8.      This court has jurisdiction over this matter pursuant to: 31 U.S.C. § 3730(b) in that the claims for relief in this action are brought in the name of the United States Government.

9.      In addition, jurisdiction exists pursuant to 31 U.S.C. § 3730(b)(1) and 31 U.S.C.§ 3732 inasmuch as this action seeks remedies on behalf of the United States for violations of 31 U.S.C. § 3729 by Defendants and Defendants transact business in this District; and venue exists in this District pursuant to 31 U.S.C.§ 3730(b)(1) inasmuch as Defendants are qualified to do business in the State of Florida, conduct substantial business in the State Florida,

2

transact business in this District, and Relator's knowledge of the facts upon which this action is based became known to Relator while working in this District.

10.    Venue is proper pursuant to 28 U.S.C. § 1391 (a) in that one or more of the Defendants do business in this judicial district.

## FACTS

11.    In or about March 1997, the Relator and the Defendants, doing business under the names of Tenet Home Care of Delray Medical Center and Tenet South Florida HealthSystem and Tenet Healthcare Corporation, entered into an employment agreement whereby the Relator, as an employee, would render Relator's employment duties, such as: quality assurance and review of medical records. The individuals for whom the Relator was to review medical services under the Agreement included persons eligible for reimbursement under Medicare.

12.    After commencing his employment with the Defendants pursuant to the Agreement, the Relator learned that Defendants were engaged in systematic and pervasive alteration, fabrication, and destruction of Medicare related documents and in billing fraud for Medicare reimbursement.

13.    In or about late March or early April, 1997, and at several intervals thereafter and continuing throughout the course of his employment, the Relator, with knowledge that it was a violation of Federal law to knowingly or willfully make or cause to be made any false statement or representation in making any claim for reimbursement or in any application for payment under the Medicare program, verbally and in writing informed the Director of Clinical Operations (Kimberly Ortiz) as well as the Administrators (Cheryl Cusimano, R.N. and Carol J. Hollins, R.N.) for Defendants, individually and in their capacities as managers and supervisors, that:

3

Relator had observed numerous instances of irregularities which were in violation of Federal and State guidelines and Tenet's Policies and Procedures and applicable Medicare standards.

14. Throughout the course of his employment the Relator frequently observed numerous and pervasive irregularities of this sort which he continued to object to and to report to his managers and supervisors. Relator voiced his objections to these irregularities and advised Defendants that he believed their practices were unlawful.

15. Defendants' response to the Relator's reports and objections was to order him to ignore the irregularities or to segregate any papers which were improper so that the Defendants could make changes and "fix" the documents at a later date to give them an appearance of being appropriate for billing and so that the bills would not be rejected by Medicare.

16. An often repeated refrain of the Defendants' managers was that they knew what was required by the law and by their own policies and procedures, but that the Relator "should join the real world."

17. Relator also complained to the Defendants' Corporate Compliance Officer (Larry Sneed) and Myla Reizen (Senior Legal Counsel) that he had been observing a persistent and pervasive pattern of Medicare fraud and abuse.

18. Their response was to ignore the problem and try to cover up any specific examples brought to their attention by the Relator. Thereafter, they began to paint the Relator as a trouble maker and a malcontent.

19. RNs (registered nurses), LPNs (licensed practical nurses), CNAs (certified nurse assistants), and PTs (physical therapists), Occupational Therapists (OTs), and Social Workers (MSWs), as well as the Administrator and the Director of Clinical Operations (DCO), while employed

by Defendants and on behalf of Defendants have actively engaged or directed with the knowledge of Defendants in purposefully, intentionally, and knowingly falsifying documents in patient charts by creating documents after the fact, i.e. after care has been provided. Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999. Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

20. Individuals whom the Relator has personal knowledge have engaged in or directed the falsifying of documents in patient charts by creating documents after the fact include, but are not limited to: the former (approximately March 1997 - December 1998) Administrator Cheryl Cusimano, R.N.; the present (approximately December 1998 - present) Administrator Carol J. Hollins, R.N.; the Director of Clinical Operations Kimberly Ortiz; Supervisor Patient Care Coordinator Tyia Dawson, R.N.; Supervisor Patient Care Coordinator Lydia Lorie, R.N.; Supervisor Patient Care Coordinator Toni Verner, R.N.; Simone Witkin, R.N.; Sherry Cashio, R.N.; Deborah Cosman, R.N.; Dulce MacAndrews, R.N.; Kati McWey, R.N.; Rita Mellul, R.N.; Tara Rudakas, R.N.; Susan Rafferty, R.N.; Bonnie Rubin, R.N.; Alice McTigue, R.N.; Deborah Tornello, R.N.; Pearl Van Houtteghen, R.N.; Carol Hurst, L.P.N.; Vincent Williams, CNA; Victorine Ritfield, CNA; Lipson Edmond, CNA; Nina Macklin, PCA; Alba Cortes, CNA; Sandy Parrott, CNA; Cindy Schauer, PT; Tim Shutes, PT; Rochelle Feldhaus, PTA; Alice Francis, MSW; Kathie Reilly, MSW; and Barbara Lynch, OT.

21. RNs (registered nurses), and PTs (physical therapists), and Occupational Therapists (OTs),

as well as the Administrator and Director of Clinical Operations (DCO), while employed by Defendant and on behalf of Defendants have actively engaged with the knowledge of Defendants in purposefully, intentionally, and knowingly falsifying documents in patient charts by back-dating documents attempting to place them within certification periods and/or within Defendants' policies regarding required time frames.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment  when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

22.   Individuals whom the Relator has personal knowledge have engaged in or directed the falsifying of documents in patient charts by back-dating documents attempting to place them within certification periods and/or within Defendants' policies regarding required time frames, include but are not limited to: Judith Stillman, R.N.; Bonnie Rubin, R.N.; Rita Mellul, R.N.; Sheri Cashio, R.N.; Cindy Shauer, PT; and Barbara Lynch, OT.

23.   RNs (registered nurses), CNAs (certified nurse assistants), as well as the Administrator and Director of Clinical Operations (DCO), while employed by Defendant and on behalf of Defendants have actively engaged with the knowledge of Defendants in purposefully, intentionally, and knowingly falsifying documents in patient charts by creating reports where no report had been made to use as chart entries to "cover" the chart so as to avoid detection of matters in the patient chart contrary to Federal regulations and/or Defendants' policies and procedures.   Relator first became aware of these activities shortly after he began his

6

employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment  when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

24.    Individuals whom the Relator has personal knowledge have engaged in or directed the falsifying of documents in patient charts by creating reports where no report had been made to use as chart entries to "cover" the chart so as to avoid detection of matters in the patient chart contrary to Federal regulations and/or Defendants' policies and procedures, include but are not limited to: Jory Malis, R.N.; Susan Rafferty, R.N.; Bonnie Rubin, R.N.; Lydia Lorie, R.N.; Tyia Dawson, R.N.; and Vincent Williams, CNA.

25.    The Administrator and Director of Clinical Operations (DCO), while employed by Defendant and on behalf of Defendants have actively engaged with the knowledge of Defendants in purposefully, intentionally, and knowingly directing office personnel and temporary employees to falsify documents in patient charts by placing date stamps for date received falsely on documents upon discovery that documents are in the chart without any date stamp to signify when received.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment  when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

26.    RNs (registered nurses), Occupational Therapists (OTs), Social Workers (MSWs), and PTs (physical therapists), as well as the Administrator and Director of Clinical Operations (DCO),

while employed by Defendant and on behalf of Defendants have actively engaged with the knowledge of Defendants in purposefully, intentionally, and knowingly falsifying documents in patient charts by creating and/or fabricating orders for patient care which have never been discussed with the referring physician and providing patient care under such orders. Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999. Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

27.   Individuals whom the Relator has personal knowledge have engaged in knowingly falsifying documents in patient charts by creating and/or fabricating orders for patient care which have never been discussed with the referring physician and who have provided care under such orders includes but is not limited to: Pearl Van Houtteghen, RN; Lydia Lorie Marrero, RN; Barbara Lynch, OTR; Karla Taylor, PT; Susan Rafferty, RN; Deborah Cosman, RN.

28.   RNs (registered nurses), CNAs (certified nurse assistants), and PTs (physical therapists), as well as the Administrator and Director of Clinical Operations (DCO), while employed by Defendant and on behalf of Defendants have actively engaged with the knowledge of Defendants in purposefully, intentionally, and knowingly falsifying documents in patient charts by placing false dates on documents. Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999. Upon information and belief from reliable sources currently employed by

8

Defendants, these activities have continued through the date of filing of this complaint.

29.     Individuals whom the Relator has personal knowledge have engaged in falsifying documents in patient charts by placing false dates on documents include but are not limited to: Tina Nelson, RN; Kimberly Ortiz, RN, DCO; Jory Malis, RN.; Cheryl Cusimano, Former Administrator; Carol J. Hollins,  Present Administrator; as well as Kimberly Ortiz, DCO, would direct clerical staff, medical records staff, and office managers to place dates on documents without regard to the truthfulness of the date but merely to have a date appear on the document as directed by management.

30.     RNs (registered nurses), as well as the Director of Clinical Operations (DCO), while employed by Defendants and on behalf of Defendants have actively engaged with the knowledge of Defendants in purposefully, intentionally, and knowingly falsifying documents in patient charts by dating order dates for patient care after the date indicating when patient care was provided.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment  when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

31.     Individuals whom the Relator has personal knowledge have engaged in dating order dates for patient care after the date indicating when patient care was provided include but are not limited to: Pearl Houtteghen, RN; Lydia Lorie Marrero, RN , Nurse Supervisor; Cindy Schauer, PT.

32.     RNs (registered nurses), clerical staff, as well as the Administrator and Director of Clinical

9

Operations( DCO), while employed by Defendants and on behalf of Defendants have actively engaged with the knowledge of Defendants in purposefully, intentionally, and knowingly falsifying documents in patient charts by removing documents from patient charts and replacing them with fabricated documents so as to avoid detection of fraud and abuse. Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999. Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

33.  Individuals whom the Relator has personal knowledge have engaged in or directed others to remove documents from patient charts and replace them with fabricated documents include but are not limited to: Kimberly Ortiz, DCO; Cheryl Cusimano, Former Administrator; Lydia Lorie Marrero, RN Nurse Supervisor; Tyia Dawson, RN Nurse Supervisor; Deborah Polacek, RN Admission Coordinator.

34.  RNs (registered nurses), as well as the Administrator and Director of Clinical Operations (DCO), while employed by Defendants and on behalf of Defendants have actively engaged with the knowledge of Defendants in purposefully, intentionally, and knowingly falsifying documents in patient charts by creating and/or falsifying documents to cover the fact of having performed care and/or services not needed, i.e. such as providing wound care where there was no wound to treat. Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5,

1999. Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

35. Individuals whom the Relator has personal knowledge have engaged in or directed creating and/or falsifying documents to cover the fact of having performed care and/or services not needed, such as wound care where there was no wound include but are not limited to: Dulce MacAndrews, RN; Rita Mellul, RN; Francis Verner, RN Nurse Supervisor; Kimberly Ortiz, DCO; Cheryl Cusimano, Former Administrator; Lydia Lorie Marrero, RN; Tyia Dawson, RN Nurse Supervisor.

36. RNs, CNAs, OTs, and PTs deviated from the plans of care, suspended patient care and/or arranged the schedule of patient care for the convenience of Defendants' personnel or due to lack of availability of Defendants' personnel to service the patient in accordance with the plan of care and/or due to mere negligence of Defendants' personnel. Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999. Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

37. Individuals whom the Relator has personal knowledge have deviated from the plans of care, suspended patient care and/or arranged the schedule of patient care for the convenience of Defendants' personnel or due to lack of availability of Defendants' personnel to service the patient in accordance with the plan of care and/or due to mere negligence of Defendants' personnel, include but are not limited to: Rebecca Fulton, RN (Psychiatric Nurse); C. Tracy

Preston, COTA; Judith Stillman, RN.

38.    DCO, Administrator, Nursing Supervisors, RNs and PTs have engaged in fraud and abuse by certifying non-homebound patients as home-bound by falsifying documents.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

39.    Individuals whom the Relator has personal knowledge have engaged in certifying non-homebound patients as home-bound included but are not limited to: Janine Juckett, RN; Lydia Lorie Marrero, RN; Tyia Dawson, RN; Bonnie Rubin, RN; Dulce MacAndrews, RN; Cheryl Cusimano, Former Administrator; Kimberly Ortiz, DCO; James Koenig, RN; Nellie Smith, RN; and Donna Powanda, RN.

40.    RNs, PTs and OTs have engaged in fraud and abuse by performing patient care and/or services not needed and/or not certified as needed.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment  when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

41.    Individuals whom the Relator has personal knowledge have performed patient care and/or services not needed and/or not certified as needed, would include but are not limited to: Dulce

12

MacAndrews, RN; Rita Mellul, RN; Sherry Cashio, RN; Judith Stillman, RN; Kara Di Angeles, PTA; Doreen D'ausilio, PTA.

42.  DCO and RN's have engaged in fraud and abuse by attaching documents to falsely demonstrate Physician participation in the Plan of Care (POC) when such participation never occurred during the certification period or during the time period asserted such as from Start of Care (SOC) date to certain later date.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment  when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

43.  Individuals whom the Relator has personal knowledge have engaged in or directed others to falsely demonstrate Physician participation in the Plan of Care when such participation never occurred during the cert period or during the time period asserted such as from Start of Care date to certain later date include but are not limited to: Kimberly Ortiz, RN, DCO; Jory Malis, RN; Lydia Lorie Marrero, RN Nurse Supervisor; Tyia Dawson, RN; Pearl Houtteghen, RN; Rita Mellul, RN.

44.  RN's CNA's and LPN's and PT's have engaged in fraud and abuse by performing patient care without orders.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment  when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

45.    Individuals whom the Relator has personal knowledge have engaged in or directed others to perform patient care without orders include but is not limited to: Kimberly Ortiz, DCO; Lydia Lorie Marrero, RN, Nurse Supervisor; Tyia Dawson, RN, Nurse Supervisor; Cheryl Cusimano, RN, Former Administrator; Carol J. Hollins, RN Present Administrator; Tara Rudakas, RN; Tammi Stein, OT; Tina Nelson, RN; Nina Macklin, PCA; Sandra Parrott, CNA; M. Perez, OT; Ken O'Sullivan, PT; Carol Hurst, LPN; Alice Francis, LCSW; and Rochelle Feldhaus, PTA.

46.    RN's CNA's and LPN's and PT's have engaged in fraud and abuse by performing patient care contrary to orders.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment  when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

47.    Individuals whom the Relator has personal knowledge have engaged in or directed others to perform patient care contrary to orders include but are not limited to: Barbara Lynch, OT; Deborah Cosman, RN; Kati McWey, RN; Ken O'Sullivan, PT; and Dulce MacAndrews, RN.

48.    Defendants' officials such as the Administrator and DCO would direct employees internally to alter documents after the fact in order to qualify the service provided for reimbursement where service would not otherwise qualify because (a) it was not needed (b) it was not provided or (c) it was not documented in accordance with regulations and/or Defendants' Policies and Procedures.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated

14

throughout the duration of his employment  when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

49.  Defendants' officials such as the Administrator and DCO would direct employees internally to ignore regulatory requirements and Defendants' policies and procedures and falsify dates and signatures, and/or information, including having any doctor willing to sign orders sign where referring physician refused to sign and/or failed to sign orders before or at the end of the certification period or after the certification period had expired.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

50.  Defendants' officials such as the Administrator and DCO would direct employees internally to have the DCO sign for RN or have RNs sign for other RNs so as to generate paperwork needed in patient chart to avoid scrutiny and/or discovery of non-compliance and/or fraud, upon the Defendants' discovery that necessary paperwork was not in the charts.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

51.    Individuals whom the Relator has personal knowledge have engaged in directing others to or in signing for other RN s so as to avoid scrutiny and/or discovery of non-compliance and/or fraud include but are not limited to: Carol J. Hollins, Administrator; Kimberly Ortiz, Director of Clinical Operations; Jory Malis, RN ( Education Director).

52.    Defendants' officials such as the Administrator and DCO would direct employees internally to put "questionable" non-compliant billing information in "special" files so as to allow Defendants to fix documents to permit billing for services rather than lose revenue.  Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999.  Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

53.    Individuals whom the Relator has personal knowledge have engaged in directing employees internally to put "questionable" non-compliant billing information in "special" files so as to allow Defendants to fix documents as related in Paragraph 52 above include but is not limited to: Carol J. Hollins, Administrator; Barbara Scott, Administrator and Director of Nursing, Tenet Home Care of West Boca Medical Center ( Her authority extended over Dade, Broward, and Palm Beach County); Kimberly Ortiz, Director of Clinical Operations, Tenet Home Care of Delray Medical Center.

54.    DCO Kimberly Ortiz,  Cheryl Cusimano, RN (Former Administrator) and Carol J. Hollins, RN (Present Administrator) actively participated in and are presently participating in fraud and abuse by instructing field employees and office staff on how to alter documents, when to

16

alter documents, when to replace documents in patient files and when to destroy documents and replace them with false documents to avoid detection of improper services and/or billing and documentation. Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999. Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

55.   Doctors, at the instruction and behest of Defendants, have signed incomplete Plans of Care.

56.   Individuals whom the Relator has personal knowledge have signed incomplete plans of care include but are not limited to: Dr. Stephen Coletti, M.D.; Dr. Martha Oldrich, DPM.

57.   Doctors, at the instruction and behest of Defendants, have signed Plans of Care after the certification period. Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999. Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

58.   Individuals whom the Relator has personal knowledge signed Plans of Care after the certification period had expired include but are not limited to: Dr. Kim Richard, M.D.; Dr. Lynda Altman, M.D.; Dr. Jeffery Braun, M.D.; Dr. Eugenio Rodriguez, M.D.; Dr. Joseph Krause, M.D.; Dr. Benjamin Tripp, M.D.; Salem Habal, M.D.; Dr. Peter Downing, M.D.; Dr. Dennis J. Egitto, M.D.; and Dr. Steven Cohn, M.D

59.   Doctors, at the instruction and behest of Defendants, signed Plan Of Care when they were

17

not the referring physician to help Defendants cover its records with a signed Plan Of Care.

60.   Individuals whom the Relator has personal knowledge have engaged in signing Plans of Care when they are not the referring physician include but are not limited to : Dr. Alan Zelcer, M.D.

61.   Doctors, at the instruction and behest of Defendants, have back-dated Plans of Care. Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999. Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

62.   One such doctor who engaged in the activities in paragraph 61 above is Dr. Joseph Krause, MD, in the case of patient Mildred Golden as shown on the Plan of Care Form 485 for that patient.

63.   Defendants' Administrator and DCO have ordered staff to reprint Plans Of Care because the Plans of Care in charts were signed by Doctor after the certification period. Then Defendants placed the altered documents in patient files to bill accordingly. Relator first became aware of these activities shortly after he began his employment in March of 1997 and observed that these activities continued unabated throughout the duration of his employment when he was suspended on or about April 5, 1999. Upon information and belief from reliable sources currently employed by Defendants, these activities have continued through the date of filing of this complaint.

64.   Senior corporate management for Defendants such as Larry Sneed, and Myla Reizen (Senior

18

Legal Counsel) were shown evidence of fraud and abuse and refused to acknowledge it, stop it, interfere with it, and condoned it.

65. Defendants' Administration instructed Quality Assurance (Quality Improvement) to not look for certain things in their reviews and designed the review system to avoid detection of fraud and abuse and to push through fraud and abuse for purposes of having billable services.

66. Defendants are not following the mandate to give Patient Choice to its referrals. Defendants Home Health Agency frequently prepares Patient Choice Forms for patients to sign so that a form appears in the chart to avoid scrutiny on this issue and avoid detection of non-compliance. This form should be prepared by the hospital and presented to the patient before discharge so that the patient may make an informed choice of providers.

67. Defendants over-bill for supplies which were either not used, not necessary for patient care, not ordered, or clearly excessive under community standards of care.

68. Individuals whom the Relator has personal knowledge have engaged in over-billing for supplies which were not used, not necessary for patient care, not ordered, or clearly excessive under community standards of care would include but not be limited to Barbara Scott, Administrator and Director of Nursing for Tenet Home Care of West Boca Medical Center; Carol J. Hollins, Administrator; and Kimberly Ortiz, Director of Clinical Operations, RN, DCO.

69. Defendants' Medical Director, Dr. Bruce Levin has falsely presented documents upon which the Defendants base payment to such Physician for his services as Medical Director.

70. Defendants' Medical Director, Dr. Bruce Levin has submitted bogus reviews and paperwork indicating reviews when an examination of the patient's records indicates that no doctor

19

would have reviewed such records and missed such obvious shortcomings. Such reviews include the Director's using incorrect patient identification, wrong start of care dates, inconsistent observations regarding patient care, and incomplete reviews.

71. Defendants have used improper billing codes to justify improper billing.

72. Defendants' Administrator in consult with Defendants' Billing Manager, Sheri Montgomery has instructed data entry staff to use Occurrence Code 05 on all Starts of Care without investigating as required by regulations whether such case is a Medicare Secondary Payor case. This was done to insure quick Medicare reimbursement.

73. Defendants have intentionally misrepresented to Medicare Intermediary that Defendants had diligently investigated whether each such case was in fact a Medicare Primary Payer case.

74. Defendants have blatantly failed to safeguard the confidentiality of patient medical records and frequently compromised such confidentiality for no more reason than Defendants' personnel's own convenience and/or irresponsible negligence.

75. Individuals whom the Relator has personal knowledge have engaged in breaching the confidentiality of patient records for no more reason than their own convenience include but are not limited to: Cheryl Cusimano, Former Administrator at THC of Delray Medical Center, who took copies of charts home to review them; Dr. Levin, Medical Director took original charts of patients home to do reviews; Kimberly Ortiz, DCO allowed field staff to take home original patient documents to make changes and corrections to the documents (one such staffer even took the documents to Church to work on them); medical records room was left unlocked after hours with open access to janitorial personnel; medical records were left in stacks at the education manager's desk, the nursing supervisors' desks, the billing audit

general area.

77.    Defendants have arranged for improper indirect compensation to physicians for referral of patients. Defendants would provide care to patients which Defendants knew were not billable to Medicare.

78.    Individuals whom the Relator has personal knowledge have benefitted by indirect compensation as referred to in paragraph 76 above include but are not limited to: Dr. Lloyd Berkowitz (patient was Natalie Gottlieb).  On numerous occasions the Administrator, Cheryl Cusimano instructed personnel to do free visits to non-qualified patients so as not to upset the doctor and cause a loss of referrals from the doctor.

79.    Defendants have encouraged patients to make doctor visits to referral physician so that the doctors have reimbursable visits to keep doctor happy with using Defendants' facilities.

80.    Individuals who benefitted from Defendants encouraging patients to make doctor visits to their referring physician whom Relator has personal knowledge of includes but is not limited to : Dr. V. Mansourian.  Dr, Mansourian sent a written memorandum to Defendants dated September 30, 1997 which states "Please continually reinforce your patient's compliance with a follow-up visit to my office within three weeks after care starts.  This is the only way I can legally sign the Plan of Treatment for sixty days.  If a patient does not come to my office for follow-up, I will only sign order for 30 days".

81.    Defendants have created situations that allow for  multiple billing by physicians to Medicare for Plan of Care Oversight in that multiple doctors would sign same Plan of Care where each doctor did not know if they were the attending physician who should be signing the orders.

82.    Defendants have engaged in the improper use of standardized diagnostic and procedural

coding as a result of incompetence and to avoid scrutiny of the diagnosis resulting in putting incorrect diagnoses on Form 485 Plan of Care.

82.   Defendants have for a period of several months at the Delray Medical Center operated without a Director of Nursing, and Administrator told employees that in the event surveyors appeared they should identify the Administrator as the DCO and identify someone else as the Administrator.

83.   Defendants have, upon Medicare sending specific request for specific chart review, customarily reviewed and altered documents to satisfy review, which efforts often included falsifying documents, creating documents, dating documents, or not sending charts at all and allowing them to purge from system to avoid scrutiny of what Defendants knew was wrong.

84.   One example of an incident about which the Relator has personal knowledge of an abuse or wrongdoing by Defendants is: On 3/9/99 Relator observed that the patient chart for Nathan Camaras, MR ID # 18265-1, reflected that during the week of 1-11-99 only three Aide visits were reported done in the chart whereas the Plan Of Care required four visits.  Typical of the agency's response to such a situation, the Aide, Vincent Williams, was instructed to prepare a Missed Visit Report reflecting some reason why he did not visit the patient in accordance with the Plan of Care and to date the report as though he had prepared it during the week of 1-11-99.  As was the normal practice at the agency the Missed Visit Report was prepared by Mr. Williams, who although he could not recall why the visit had been missed "came up with a reason", filled out the report and placed it in the patient's chart.  This deviation of care was not reported to the patient's physician.

85.   One example of an incident about which the Relator has personal knowledge of an abuse or

wrongdoing by Defendants is: On 3-22-99 Relator in the course of his review of patient charts for a billing audit, observed and noted in writing to the agency that concerning patient Bertha Lieberman, MR ID # 18348-01, the Form 485 Plan of Care reflected an impossible plan of care which directed that there be Skilled Nursing services to patient beginning 01-12-99 for 3x/wk x 2 and beginning 01-18-99 for 2x/wk x 2. This impossible Plan of Care was signed by the RN and the treating Physician and date stamped by the Agency indicating February 3, 1999 as the date received. When the Physician signed off on this Plan of Care the Form 485 showed the above impossible Plan of Care. The Referral Form in this patient's chart shows the Aide visits as 3 wk _____ and is signed by the Nurse Supervisor. The Defendants later filled in the blank after care was provided. The Physician obviously did not participate in this aspect of the patient's care and thus Aide visits performed were done without doctor's orders. Relator avers that it was the standard practice of Defendants to use this "method" to determine Aide visits by determining these visits based on the longest duration of all other disciplines rather than make the determination at the outset as part of the Plan of Care in accordance with Federal guidelines and Defendants's own Policies and Procedures.

86.   One example of an incident about which the Relator has personal knowledge of an abuse or wrongdoing by Defendants is: On 3-22-99 Relator's billing audit review revealed that patient Harold Levine's,( MR ID # 18633-1) chart contained the Form 485 Plan of Care not signed by a Physician and not dated. The certification period for this Plan of Care was to end on 3-24-99. The agency was out of compliance with its own Policies and Procedures. There was one day left for Physician to timely sign the Plan of Care. Obviously, all but one day of care had been provided to the patient without any review by his Physician as to the Plan of Care

under which this patient had been seen by the Defendants' Agency.

87.    One example of an incident about which the Relator has personal knowledge of an abuse or
wrongdoing by Defendants is: On 3-22-99 Relator reviewed the chart for Patient Ellward
Laskin (MR ID # 18643-01) and observed and reported to Agency that there was no order
for Skilled Nurse visit, only for evaluation. Since this chart reflected only an admit cost such
could not be billed under Medicare guidelines. There was no date by Doctor's signature and
no date stamp received date by Agency in Locator # 22 as of 3-22-99. The last day to timely
date the Plan of Care was 3-23-99. Relator had previously discovered that it is a common
practice of Defendants to bill for such Skilled Nurse visits even when such a one-time visit
is not billable to Medicare.

88.    One example of an incident about which relator has personal knowledge of an abuse or
wrongdoing by Defendants is: Patient Harry Fenster (MR ID # 15155-1). His chart revealed
a Plan of Care purportedly signed by the Physician on 1-25-99 but date stamped by the
Defendants' Agency as received from that Doctor on 1-22-99. The chart further shows
Orders dated signed by the Doctor on 1-25-99 and stamped as received by the Defendants'
Agency on 1-22-99. Relator avers that the Defendants' Agency routinely engaged in a
practice in which stacks of orders and documents such as Plans of Care (Form 485) would
be date stamped by clerks and temporary hires with a date which they were directed by
management to put or with directions to match the date stamp to Dr.'s date. Such "dates
received" stamped on documents were not the actual date received. Instead such dates were
placed on the documents in an effort to make them within compliance. This example
demonstrates the carelessness with which such dates were placed on documents, often by

24

clerks who did not know enough to even realize that the date indicating when received by the agency from the doctor could not be before the date on which the doctor indicated he signed the document.

89.   One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Patient Frank Fiss (MR ID # 14400-2). The chart upon review by Relator reveals that an RN visit was performed on 1-24-99, however, the certification period for this patient is shown as 1-25-99 to 3-25-99. Thus the visit was not in accordance with the Plan of Care and performed without orders.

90.   One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: On 1-10-99 Relator in reviewing the chart of Patient Emmanuel Klein (MR ID # 17433) observed the following which he reported to the Defendants. Page 1, Form 485 showed a frequency and duration for Aide visit as 5x/wk x 2 but no treatment orders and did not mention frequency and duration consistent with all other patient chart documents which showed 3w2 when signed by the referral Physician and the RN and date stamped by Agency and placed in chart. Aide assignment sheet made up by RN without Orders in Plan of Care. Three pieces of documentation in chart at start of care show visit frequency for Aide as 5w2, 3w2 on Aide Care Plan; 5w2 3w___ on Referral Form; and 5w2 on Form 485. The admitting RN wrote on the Improvement Report for this patient chart "Order was called in 3w (BLANK) because I was unsure how long PT would be in". Relator avers that this is one of many examples of the Defendants' practice of determining Aide's frequency and duration after the fact to match the longest discipline's duration.

91.   One example of an incident about which relator has personal knowledge of an abuse or

25

wrongdoing by Defendants is: Relator observed and reported to Defendants that a review of Patient Frank Marincola's (MR ID # 18837) chart shows the same Physician Order # 1308 appears twice in the chart with two different dates, one shows 2-26-99 and one shows 3-3-99. This patient's Form 485 , proofed by the Administrator Carol Hollins and signed by the referral Physician, shows in Box 21 that the plan includes "NMED regime". Relator is not aware that this has any meaning in reference to patient care. The service orders for this patient read "wound care to prxmity and complexily of woundcare" which instruction is signed off on by both the RN for the Defendants and the referring physician.

92.   One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of patient Moe Berger's chart (MR ID # 18855-1) Relator observed and reported to Defendants the following. The certification period on the Form 485 is shown as 1-29-99 to 3-29-99 and the start of care date is shown as 1-29-99. The chart reflects that the patient was seen on 1-28-99, indicating the patient was seen without orders and that the plan of care was not followed. The doctor's orders for this patient are dated 1-29-99. The RN writes as an "explanation" "Start of Care was done 1/28 and saw again on 1/29-don't know why or how POT got dated 1/29/99".

93.   One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: A review by Relator of Patient Robert Walterbach's chart (MR ID # 17827) revealed the following which was reported to the Defendants. The Defendants Agency billed for 7 rolls of 2 inch micropore (tape) which was supposedly used in a 16 day period for one BID ABD dressing. Each roll contains 15 yards per roll. A review of the patient's chart demonstrates there was no way this amount could have been used on patient

26

nor would such be medically necessary.

94.     One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: A review by Relator of Patient Margaret Cooper's chart, which information was made known to the Defendants, revealed that this patient was treated without physician orders. The chart contains a OT evaluation dated 2-15-99 which is signed by the Director of Therapy Services. No interim order is in the chart. Order in chart states OT eval and treat 2-16-99. As of Relator's review on 3-29-99 the verbal order form is unsigned by doctor and nurse/therapist. Occupational Therapy shows 3x/wk 1. Occupational eval on 2-16-99 shows plan of care as 2wk1, 3wk3. The OT apparently came up with frequency and duration without any orders and her own document in the patient chart shows she did not contact the patient's doctor but merely contacted Defendants' RN.

95.     One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: A review by Relator of Patient chart for Isabel Luzzi (MR ID # 11672-4) demonstrates that five visits in January 1999 were without Physician orders. The only Physician Order reference in the chart says "yes to physical therapy". The PT recommended the frequency and duration without any contact with referring Physician. The chart documents show the PT contacted the therapy office PTA. Additionally, the chart demonstrates a discrepancy between the Verbal Order Form (Doctor's Orders) and the RN Progress Notes. The RN notes shows a date of 1-8-99 as date of order from physician. The Verbal Order Form signifies a verbal order date of 1-12-99 and moreover, that form shows a transcription date of 1-11-99 (which date would precede the date of the order itself).

96.     One example of an incident about which relator has personal knowledge of an abuse or

wrongdoing by Defendants is: Relator's review of a patient chart for Gertrude Harmatz showed the following inconsistencies which were reported to the Defendants. The service orders show a date of 10-16-98 with a strike-over on the "16" indicating below that the number "25". This strike over is not signed nor dated. The chart further reveals an order date of 11-24-98 for an extra visit which was done on 10-25-98 which it also erroneously shows as in the week of 10-19-98. The verbal order transcription form shows an order date of 11-24-98 for an extra visit on 10-16-98 which it states was transcribed on 12-2-98.

97. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: A review by Relator of the patient chart for Mildred Van Cleve (MR ID # 18006) revealed the following which was reported to the Defendants. The Physician Verbal Order for patient care is dated 1-13-99 and is signed by the doctor with a date indicated of 1-20-99. The visits purportedly covered by these doctor's orders occurred on 1-8-99, 1-9-99, and 1-10-99. This patient was a wound care patient, which is usually a serious patient matter. Relator avers that this exemplifies the frequent practice of Defendants whereby services, even for serious matters, were rendered without any order from the Physician. The Defendants' response to Relator's objection to this practice was "To cover ourselves legally we have to put an order in the chart". This example demonstrates the common practice of Defendants to create, i.e. fabricate a verbal order transcription. It was necessary to date the transcription on the date done as the computer assigned a sequential number which should match the date indicated, thus the date of order on this created document, as demonstrated above, shows an order date which is after the services were provided. Thus the services had been provided without any doctors orders and without any

28

input from the doctor.

98.     One example of an incident about which relator has personal knowledge of an abuse or
        wrongdoing by Defendants is: A review of this patient's chart for billing audit purposes
        revealed the following which Relator reported to Defendants. Patient Klara Koch (MR ID #
        18499).  The Plan of Care shows a certification period of 1-19-99 to 3-19-99.  On 3-19-99
        Relator reviewed the patient chart and noted that the Plan of Care Form 485 was not signed
        by the Doctor and not stamped with any date received by the Defendants.  He informed the
        Defendants that the visits for this patient were not billable and he crossed out all visits for
        billing on the form submitted to Defendants.  After presenting same to his supervisor Relator
        was instructed that he was never to cross out any billing and never to delete such information
        from the computer. He was instructed that it was Defendants' common practice to place such
        files in a "special to be-billed file" where they would be held until the Defendants could get
        a doctor's signature and then put a date on the form and thereby "fix" the deficiency and bill
        for the services.

99.     One example of an incident about which relator has personal knowledge of an abuse or
        wrongdoing by Defendants is: Upon review of the chart for Patient Frank Kutcel (MR ID #
        18528) Relator noted to Defendants that the OIR Form shows that the frequency of visits for
        this patient had not been met for the week of 2-1-99.  One more visit should have been made.
        As was the common practice of the Defendants, in order to "fix" the problem, a missed visit
        report was then made to account for the missing visit and the report was made to "Look as
        it should", meaning as it would have looked if it had been done at the time that it should have
        been done.  Clearly, the patient's doctor had not been informed of the deviation of the plan

of care of his patient.

100. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: A review by Relator of the following patient's chart revealed the following which was reported to the Defendants. The patient was Margaret Cooper. The chart demonstrates that the Defendants failed to follow the Plan of Care, failed to coordinate the patient's care; provided no notice to the patient's physician of the failure to follow the plan of care. Although the Plan of Care shows 3wks1, the RN made four visits and writes in the chart as an explanation in response to why the deviation "these were the frequencies I was given by the nurse who gave me this project".

101. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review for billing audit Relator observed the following and reported it to the Defendants which was responded to as follows. The Patient was Walter Thornsen (MR ID # 18297). On 3-18-99 Relator reviewed the chart and observed that the Form 485 Plan of Care was not signed by the Doctor and not dated by the Defendants. The certification period was from 1-10-99 to 3-10-99.   As was the usual practice of the Defendants the Relator was told to place this in the special file "hold for billing" and not to delete this billing information from the computer as the Defendants would get the document signed and date it appropriately and then submit for billing.

102. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: A review of the patient chart for Joseph Silber (MR ID # 17861-1) by Relator revealed the following which he reported to the Defendants. The Start of Care date was 12-19-98. As of 3-19-99, end of certification period, no orders signed by

doctor.  The chart showed an Interim Order for PT visit dated 1-18-99 however there was no order for PT services performed on 1-11-99.  The Plan of Care shows POC is 2wk1 as of 1-17-99.  The chart contained no PT note for 1-17-99 as required by the Plan of Care.  The chart further revealed only 2 PT notes in the medical record for week of 1-18-99 when Plan of Care required during that time period 3wk1.  Relator further noted that as 1-17-99 is a Sunday the order for 2w1 as per the Plan of Care was impossible to follow as Sunday is the last day of the week (Medicare week) only one visit could be done.

103.   One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Relator's review of patient records for Patient Esther Cassell revealed the following.  (The certification period for this patient was 8-25-98 to 10-25-98).  The PT documented the patient's rehabilitation potential as "poor", however, a data entry clerk entered "guarded" instead on the Plan of Care because "it doesn't look good for Medicare", meaning the PTs honest signification based on their observation of the patient might well have meant that the patient did not qualify for care and/or for the duration and frequency assigned.

104.   One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of the patient chart for Patient Sheldon J. Schiff, (MR ID # 4817-1) Relator observed the following which he related to Defendants.  There are three Plans of Care signed in the patient chart with M.D. signatures which do not match.  The chart reflects that M.D. orders of 2-17-98 state that Dr. "Zelcer may consult".  The Plan of Care says only "Dr. Newman can consult" and yet the chart contains a Plan of Care made out to Dr. Zelcer .  Additionally, all of these Plans of Care are dated after the certification period

had ended and long after the time frame required in Defendants' own Policies and Procedures.

105. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: A review by Relator of the patient chart for Patient Margaret A. Cooper, (Mr Id # 3916-3) revealed the following which was presented to Defendants. The certification period for this patient was 7-8-98 to 9-8-98. RN, PT, and CNA continued to visit the patient as of 9-8-98 without orders of recertification. An "official" inclusive discharge date of 9-15-98 was chosen by Defendants and the patient was "officially" "readmitted" with a new Start of Care date and Plan of Care date on 9-15-98. No new PT evaluation was done for "new" cert period and yet PTA continued to see the patient without orders. A Modification order was conceived to "cover" the PTA visits, even though these "orders" were never in fact gotten from any Doctor.

106. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Relator reviewed patient chart for Patient Robert Colton (MR ID # 14458-2) which revealed the following information and resulted in the following action by Defendants. A PT evaluation was ordered 9-16-98. There were no other orders yet PT care was provided as per PT evaluation without communication to Doctor for orders. Defendants' OIR report of 10-18-98 concerning the matter was not addressed until 11-25-98 and went as follows: The DCO (Director of Clinical Operations) for Defendants told Karla Taylor, PT to "write an order to cover these visits". Karla refused to do so stating "I don't write these orders-I haven't for 5 years. I give my eval notes to Cindy Shauer, Director of Therapy Services; she FAX's them to a PCC to write the orders for PT from my eval and I don't call the doctor unless there's a question or problem I need to discuss. You probably

have a lot of these same problems with orders if nobody is getting them". In response, Lydia

Lorie, RN, PCC agreed to write orders for Defendants, however, this was done after the

patient care had already been provided without any orders. Nurse Lorie was writing orders

she never got from a doctor verbally and the Defendants would send these on to a doctor who

would sign them. Relator further noted that the PT orders of 11-25-98 are invalid due to

being incomplete as they are missing the treatment part of the orders. Additionally, the order

for care is post-dated for care already provided without orders and Relator further observed

an impossible Start of Care date on order of 11-10-98 which is after 9-17-98 "orders" in

question.

107.    One example of an incident about which relator has personal knowledge of an abuse or

wrongdoing by Defendants is: The Relator reviewed the following patient chart and observed

the following which was reported to the Defendants. Relator learned the following from

Defendants in this matter which is reflected by documents in the patient chart. The patient

is Anne Banner (MR ID # 17258). The start of care date for this patient was 11-20-98 as per

the referral form from the Emergency Room M.D. , Dr. Carpenter, who sent the patient to

a wound treatment center for further care. The DCO for Defendants instructed Lydia Lorie,

RN, PCC to put Dr. Dabbah's name as referral (A WTC Doctor) on 12-9-98 due to the fact

that the ER doctor is not the attending M.D. and would not sign the Plan of Care orders.

Defendants "Chose" Dr. Dabbah as though he had given orders to begin patient care and

would thereby sign orders and the Plan of Care, Form 485. The Defendants' RN did the

initial evaluation before any doctor consented for PT services. Treatment by PT had already

begun without an order so the DCO for Defendants stated that she needed to find a doctor

to "cover this order" because Dr. Dabbah would not sign for PT orders on this patient. Dr. Dabbah would only sign authorizing wound care orders on this patient. This situation and many others like it resulted in multiple billing for physician oversight charges as well as the other attendant problems as set forth above.

108. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: In reviewing the patient records for Patient Benedict Mastropoalo (MR ID # 17363-1) Relator observed and learned the following. This patient had been admitted to Defendants' agency for home health care having been referred from an acute care hospital. It was discovered at the agency that there was no Patient Choice Form signed by the patient, which is required by Federal regulations, at the time of discharge from the acute care facility when the patient is making a decision about home health care providers. The Defendants, in this instance as in many others, directed their field RN to take a copy of the Defendants' Patient Choice Form and get it signed by the patient so that "A " patient choice form would be in the patient chart since it is required by law. Relator learned that it was the common practice of Defendants to solve this "problem" in this manner.

109. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Relator, upon review of this patient's chart for Defendants discovered the following. The Patient was Helen Stern (MR ID # 17601). The patients records reveals that no orders for duration of Aide visits was obtained from the physician before care was provided, but rather were conceived by a clerk working for Defendants and later sent to the referring physician for signature. The plan of treatment concerning the Aide visits was made to correspond, after the fact, with the highest duration of care by a qualified

discipline seeing this patient without any regard for or assessment of the medical need for the ultimately assigned duration of services.

110. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: In reviewing this patient's chart Relator observed the following and reported same to Defendants. The patient is Joseph Berkowitz (MR ID # 15630). The patient's chart reflects that the Order dated 10-21-98 does not state any licensed discipline's signature and date of transcription yet it is signed by the Physician. It further shows on the face of the document two discrepant "received" dates in the medical record nearly four months after the order date.

111. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of this patient's chart Relator learned the following which was reported to the Defendants. The patient is Marie Ayd (MR ID # 18731) The patient record indicates that the Order of 1-29-99 #1077 is signed by an RN who never received the order from a Physician. As the narrative states "VO Carol Hurst, LPN" meaning the Verbal Order which the RN placed in the record and relied upon came from an LPN either verbally or from her notes. According to the patient's record, the physician took no part in this order concerning his patient's care.

112. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of this patient's chart Relator became aware of the following facts relative to this patient and to a practice of Defendants. The patient is Jerome Ibbate (MR ID # 15917-1). The start of care date for this patient was 10-28-98 which meant that care began on a Wednesday. The frequency and duration was shown as

35

1D5, 5w1 which was a way to avoid a clear statement of 1D10 which meant care for 10 days in a row.  Defendants would intentionally manipulate the order format to avoid detection of daily care for 10 days in a row so as to avoid attention to a daily care case, especially where, as here, it appeared that the patient did not need nor qualify for such daily care.

113.    One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of the following patient's chart Relator observed the following which he related to Defendants.  The patient is Margaret Cooper (MR ID # 14111).  The certification period was 1-22-99 to 3-22-99.  The chart reveals that no PT orders were ever obtained from a Physician other than for evaluation visit.  The doctor signed the plan of Care Form 485 but no discipline had communicated with the doctor to get orders for PT services. Doctor was seeing this for the first time on the Plan of Care.  These PT "orders" were gleaned from the PT evaluation visit notes and "Made" into "Orders" by Defendants' staff.

114.    One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of this patient's chart Relator learned the following.  The patient was Lena Simone (MR ID # 16665-1) The start of care date was 11-5-98.  The forms indicate Skilled Nurse needed 1D3, 5W1 as a way to disguise Defendants' intent to provide and bill for daily wound care of 1D8.  The report is manipulated deliberatley as to frequency and duration as the Defendants did not believe this patient qualified as needing daily care and that this method of writing the frequency and duration would help to keep this item from being flagged for close scrutiny because Defendants believed it would not pass inspection.

115. One example of an incident about which relator has personal knowledge of an abuse or wrongdoing by Defendants is:   Upon review of this patient's chart Relator observed the following and informed Defendants of this information.  The patient is Garner Crosswhite (MR ID # 14120).  The chart includes two missed visit reports which reflect visits missed on 1-21-99 and 1-22-99 with both stating that the visits were missed due to "schedule conflict". Additionally, the OT note for 1-26-99 states "Patient getting out to have hair and nails done". The information in the chart raises serious question as to the truthfulness of the patient's homebound status.  Neither of the missed visit reports were sent to the patient's physician.

116. One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:   Upon review of this patient's chart Relator discovered the following information.  The patient is Charles Loewy (MR ID # 5402-1).  The certification period for this patient was 7-28-98 to 9-28-98.  The Plan of Care, Form 485 originally in this patient's chart was incorrectly sent to the wrong doctor, Dr. Fred Altman.  The Plan of Treatment should have been sent to Dr. Lynda Altman, M.D.  The agency discovered on 9-28-98 that the Plan of Care in the patient chart was wrong so the document, Form 485, was reprinted and sent to Dr. Lynda Altman who signed it on 9-28-98 and returned it Via Fax to the Defendants.   This was after expiration of the certification period.   This obviously indicated that the patient's physician had not reviewed the Plan of Care until all services had been rendered.  Additionally, there is no Locator #23 signature on the Plan of Care.  The Defendants removed the original document from the patient's chart and replaced it with the newly created document, destroying the first Form 485 which had been removed from the chart.  It was further noted by Relator that Defendants had failed to make a scheduled visit

37

of this patient on 8-10-98 but there was no missed visit report in the patient's chart as of 10-22-98.

117.    One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of this patient's chart Relator discovered the following activities of Defendants.  The patient is Sidney Rubin (MR ID # 4022-2).  The certification period was 6-14-98 to 8-14-98. The referring physician refused to sign the Form 485 Plan of Care.  The Defendants' Director of Clinical Operations, Kimberly Ortiz and Deborah Polacek, RN, had Defendants' Quality Assurance department reprint the Plan of Care Form 485 and sent it to Dr. Braun on 9-8-98 for signing, well after the certification period had ended.  The Plan of Care is dated after the cert period (8-17-98) on page one and is dated (8-13-98) on page two which could not be the dates he signed as it was not sent to him before 9-8-98.. Thus the disciplines which serviced this patient did so without a Plan of Care and no doctor ever reviewed the Plan of Care until well after the patient was serviced by Defendants. The dates indicated with the doctor's signature on pages one and two are false.

118.    One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of the following patient's chart Relator made the following discoveries. The patient is Sidney Diamond (MR ID # 14044-1).  The certification period was 8-30-98 to 10-30-98. The Defendants' Director of Clinical Operations, Kimberly Ortiz directed that the Form 485 Plan of Care be reprinted on 9-8-98 due to fact that Plan of Care was not signed and needed redistribution to doctor. One copy shows a date received of 8-29-98, which is before the cert period, with no physician's signature.   Another copy is

signed by physician and dated 9-15-98 which would be within the cert period.

119. One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of this patient's chart the Relator discovered the following activities by Defendants. The patient is Shirley Price (MR ID # 14218-1). The certification period was 8-8-98 to 10-8-98. The chart revealed that the original Form 485 Plan of Care was sent to Dr. A. Zelcer incorrectly as Dr. R. Blais had ordered this patient's care. The Defendants directed that the Form 485 Plan of Care be reprinted on 10-7-98 for Deborah Polacek, RN to hand carry to Dr. Blais for signing on that date. The Plan of Care Form 485 is back-dated to 10-5-98 in locator # 27. Dr. Zelcer also signed a Plan of Care which is dated 10/1 with no year indicated. The doctor's signature appears to have been copied. On the Form 485 dated 10-5-98 the Doctor's date also indicates 10-5-98 but as stated above the form was not even prepared by Defendants's until 10-7-98.

120. One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:   Upon review of this patient's chart Relator discovered the following which was reported to Defendants and particularly to Defendants' corporate compliance officer, Larry Sneed. The patient is Shana Tiley (MR ID # 5283-1). The certification period was 6-11-98 to 8-11-98. This patient was a private insurance case but is an example of Defendants' common practices.    On 8-27-98 the Director of Clinical Operations for Defendants instructed Defendants' Quality Assurance department to reprint this patient's Form 485 Plan of Care. The first Plan of Care in this patient's chart was signed by the doctor on 8-17-98 which was after the certification period. The DCO stated that Defendants' would have the doctor sign the form again and put an earlier date on it. The

document was to be hand delivered to accomplish this purpose. The first document was removed from the patient's file and destroyed. The second document, dated 10-8-98 was put into the patient's chart. Relator informed Defendants' Corporate Compliance Officer Larry Sneed that this was not an isolated example and that he could provide him with at least 16 other examples which immediately came to mind. Mr. Sneed showed no interest in seeing the other documents and dismissed the efforts of the Quality Assurance staff making it clear to Relator and others that the Defendants condoned these practices.

121.    One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:   Upon review of this patient's chart relator discovered the following facts which were again reported to Defendants and to Defendants' Corporte Compliance Officer. The patient is Mildred Golden (MR ID # 4754-1). The certification period was 2-4-98 to 4-4-98. The Defendants' Administrator Cheryl Cusimano, RN had Quality Assurance staff reprint Form 485 Plan of Care for this patient and approximately 12 others. The Plan of Care Form 485 for this patient in the chart had a blank date in locator #27 and in locator #25 was dated "6/5 received". The Plan of Care was re-dated 4-1-98. The Administrator, Ms Cusimano, apparently had this doctor, Dr. Levinson, back-date the document. Some doctors would merely sign the reprints but not date them in which case the Defendants' agents would back-date with the Defendants' date stamp. The Administrator, in response to Relator's objections to such outrageous practices was "The doctors had these POTs (Plan of Treatment or Plan of Care) in their possession anyway, and I can't bill (Medicare) these otherwise". Relator also observed that Sonya Pero, RN, another employee of Defendants offered to sign an affidavit for Defendants' Corporate Compliance Officer

attesting to these instances of unlawful practices but such offer was refused and rebuffed.

122. The following is a group of cases in which the same practice and pattern of fraud and abuse by Defendants is demonstrated. They are presented as a group to demonstrate not only what was done in each instance but to demonstrate the practice of Defendants, all of which Relator has personal knowledge of as an abuse or wrongdoing by Defendants. Upon review of the following patients' charts the Relator discovered the following activities of the Defendants to which strong objection was raised. The patients were, Oscar Ring (MR ID # 17939) Order date 1-11-99, # 1104; Belle Reisman (MR ID # 17967) Order Date 12-31-98, #791; Leonard Paul (MR ID # 17086) Order date 12-21-98, #738 and Order date 11-30-98, #442; Benjamin Katz (MR ID # 14076) Order Date 10-16-98, # 1175; Ann Genburg (MR ID # 17714) Order date 12-18-98, # 762; Robert Drogoson (MR ID # 17478), Order date 12-17-98, # 767; Leona Charron (MR ID # 17224) Order date 12-03-98, # 495; Harry Birnbaum (MR ID # 15471) Order date 12-21-98 # 783; and Betty Arlein (MR ID # 16492) Order date 12-2-98 #485. The above instances reflect the manner in which Defendants would resolve such problems as patients files missing necessary documents without which the Defendants could not support submitting billing to Medicare. In the above instances the Defendants discovered that there were no orders in these patients files. The Director of Clinical Operations reasoned that Defendants could create these written transcriptions of verbal orders in this wholesale fashion and thereby "cover" these patient files with paperwork that, unless closely scrutinized, would not reveal the fabrication. These transcriptions were prepared at the direction of the DCO, Kimberly Ortiz, and on the face of the documents demonstrate that the DCO signed for other RNs, and other RNs signed for other RNs, and RNs signed for LPNs just to get

these documents done. In many of these instances the order date post dates the services performed because in fact there was no order at the time the care was provided. In these instances Nurses are signing orders for patient care which the signing nurse did not receive from the patient's physician.

123.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of the following patient's chart Relator discovered the following deficiencies and objected to Defendants' practices. The patient is Dorothy Tuminello (MR ID # 15152-1). The certification period was 9-15-98 to 11-15-98. The chart revealed that the referring physician refused to sign the Plan of Treatment with a notation as to why. In such instances it was the Defendants' practice to find a doctor who would sign the Form 485 Plan of Care. The DCO set out to get Dr. Berenson to sign the Plan of Care after 11-15-98. It is not known whether the document now in the chart bears his or another signature and with what date, however it is known that it could not have been signed by any doctor until after the cert period. Further, there is a signature by Dr. Tripp as to a portion of this Plan of Care dated as 1-8-98 (which apparently was meant to be 99) which was well past the certification period. As of 11-15-98 the Plan of Care in the chart was undated and unsigned.

124.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review for billing audit Relator discovered the following situation with this patient's chart and upon informing Defendants observed practices he strongly objected to as illegal. The patient is Lefterio Alexander (MR ID # 17340-1). The certification period for this patient was 11-24-98 to 1-24-99. The Plan of Care Form 485 was

signed by the Physician and not dated and locator #25 is date stamped 1-25-99. This patient's chart further reflects that skilled nurse care was provided without orders and not in line with the Plan of Care for the week of 12-14-98. Relator believes Defendants, sent the document to the Physician on 1-25-99 via fax as imprint on top of page indicates and after obtaining doctor's signature (after the cert period) then submitted for billing.

125. One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of this patient's chart Relator observed the following. The patient is Marianne Savela (MR ID # 18095-1). The certification period was 12-29-98 to 2-28-99. Here again the patient chart reflects that the Form 485 Plan of Care was not signed by the physician until after the certification period had expired. The doctor's signature is dated after the cert period ended.

126. One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of this patient's chart Relator observed the following activity by Defendants which he objected to as improper fraud and abuse. The patient is Samuel Kohan (MR ID # 17235). The start of care date was 11-23-98. The chart contains an order dated 1-13-99, # 898, which was written by the RN to "cover" her own scheduling error for care already performed without orders on 12-30-98. Additionally, the Plan of Care Form 485 shows that the Physician ordered wound care only on 12-22-98. No other care was covered by Physician's orders. Nurses frequently admitted to relator that they would provide care without orders, as here, deciding on their own what should be done for the patient, and then create an order, as here, to "cover" the chart for billing purposes.

127. One example of an incident about which Relator has personal knowledge of an abuse or

43

wrongdoing by Defendants is:   Upon review of this patient's chart Relator observed and reported to Defendants the following.  The patient is Jeremy Summers (MR ID # 15145-1). The certification period was 9-16-98 to 11-16-98.  The first Doctor to whom the Plan of Care was sent refused to sign.  Defendants reprinted the Plan of Care for a different doctor to sign and sent for signature.  The document in the chart shows that the Plan of Care Form 485 was signed by this doctor and not dated and was dated by Defendants after the cert period ended.

128.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:  Upon review of this patient's chart Relator noted and reported the following to Defendants.  The patient is Virgil Turrin.  The certification period is 9-29-98 to 11-29-98.  A review of the Plan of Care Form 485 revealed that the plan was signed by Dr. Charrasquilla but is dated next to his signature in different ink.  Locator #25 is dated after the cert period had ended.  Plan of Care 485 in file signed by Dr. Cohn is dated after cert period for this same cert period as other Plan of Care.

129.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of patient chart Relator discovered the following which was reported to Defendants.  The patient is Alice Klein.  Order number 1234 is dated 2-18-99 as order date, however, the services were rendered on 2-11-99.  There are two date stamp dates on the order for "date received".  Relator believes to be another instance of orders being created after the fact for purposes of justifying billing for these services.

130.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:  Upon review of this patient's chart Relator made the following observations known to Defendants and protested the Defendants' approval of such actions.

The patient is Dorothy Glauben (MR ID # 14053-2)  The start of care date was 12-8-98.  The chart entries by the RN on visits for wound care show visits made less than 6 hours apart. This is not within the guidelines, community standards, or Defendants' own policies and procedures.   These visits were arranged and performed in time frames solely for the convenience of Defendants' personnel.  These visits occurred on 1-16-99; 1-18-99; 1-21-99; 1-22-99; 1-23-99; 1-25-99; and 1-26-99.   Relator was told by Defendants upon raising objection to billing for these services and objecting to this paractice that he was not to be looking for such instances as these and he should ignore such findings in the future and not interrupt billing of such claims.

131.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:  Upon review of the following patient's chart Relator observed the following which he notified Defendants of and raised objection thereto.  The patient is Nathan Camras .  The missed visit report in the patient's chart signed by Defendants' Aide, states that the scheduled visit was not made and that the patient's needs were met at the doctor's office.  In truth and in fact, the services and care to be provided by Defendants' Aide could not be met in the doctor's office as they include such things as bathing the patient, putting lotion on the patient's skin; taking care of other  hygiene needs of the patient and so forth.  This record in the patient's chart conveys an attitude of complete lack of interest in patient care as well as false representations in the patient record.

132.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:  Upon review of the following patient's chart Relator observed the following and reported same to Defendants.  The patient is Harry Birnbaum (MR ID #

15471-1).  As of Relator's review on 2-8-99 the Aide note of 12-3-98 is void of any care given as of the date of review.  The record also reflects that care was provided to patient without orders on 12-21-98 for MSW and by PT on visits made 12-19-98, 12-21-98, 12-22-98, 12-23-98 and 12-28-98.  The Director of Clinical Operations told Relator that if the Aide could remember what he did on previous dates for patient he could just do a report now.  The Aide told Relator that he could not possibly recall what he might have done for this patient two months earlier considering all the visits he makes to various patients so he would just put something in the reports to make them look right.  Although Relator observed that as of 2-8-99 the document in the chart was blank he believes it was subsequently filled in by the Aide and will now appear in the patient chart with what appear to be appropriate check marks for services provided and billed for.

133.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:  Upon review of the following patient's chart Relator observed the following and reported same to Defendants. Patient name is Edith Morton (MR ID # 5101-1).  The chart reflects documentation showing confusing dates.  The referral start of care date has been changed from 4-16-98 to 4-18-98 but referral documents state that an RN visit to this patient who just got out of the hospital is needed on 4-16-98.  The worksheet by RN is changed to 4-16-98 start of care date yet admission documents are dated 4-18-98 and page 1 of data base admit date is changed from 4-16-98 to 4-17-98 to 4-18-98.  Orders show begin date of 4-18-98.  Apparently the patient was not seen as ordered on 4-16-98 and in fact was not seen for two days despite medical necessity.  The records are altered to disguise this fact.

134.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:  Upon review of the following patient's chart Relator observed the following and reported same to Defendants.  The patient is Jerome Cohen (MR ID # 5049-1).  The start of care date is shown as 4-6-98.  The cert period is 4-6-98 to 6-6-98.  The chart reflects that the patient was seen on 4-6-98 and care was provided., however, the admission packet prepared by Defendants' agents, shows paperwork dated 4-7-98.  Another skilled Nurse report shows orders beginning 4-7-98.  Nurse supervisor documents 4-6-98 as date "admitting" nurse called in report to her but patient not admitted by this nurse until 4-7-98.  The consent form is dated 4-6-98.  Defendants' explained to Relator that Defendants often do not have RN available to do admit so they send RN to make a skilled visit and then admit assessment follows next day.  Here, as in many other such cases, there was no emergent need to see patient on 4-6-98.

135.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:  Upon review of the following patient's chart Relator observed the following and reported same to Defendants. The Patient was Stanley Anslow (MR ID # 5074-1).  The certification period was 4-8-98 to 6-8-98.  The patient's chart contains a Patient Choice Form which is required when a patient is referred from a hospital discharge.  The Patient Choice Form is signed after the start of care date for this patient.  This case was a doctor referral case not a hospital discharge.  The Defendants so routinely got patients to sign such forms when they were missing from their charts to insert in the record that they even got the form signed by the patient when it was unnecessary and when, as here, the contents of the form which the patient was given to sign have no relation to real facts of the

47

case. The skilled nurse signed the consent form on 4-8-98 and the form indicates the patient signed on that date as well. However, that nurse did not visit the patient on 4-8-98,( another nurse made that visit), but rather on 4-9-98 as reflected in the chart. The referral eval form shows the Start of Care date changed by strikeover from 4-8-98 to 4-9-98. A second referral eval form in the chart shows the start of care date first as 4-8-98 then a strikeover changed it to 4-9-98 and then a writeover changed the 9 back to an 8. The Defendants could not decide what should be the actual start of care date to square with the date services had been rendered. The chart contains an intake form which shows a number of strikeovers and writeovers concerning Aide visits frequency and duration and shows the choice of MSW first as refused and then scratched out and marked offered. Originally the form showed 1 Day 10 which is scratched out and replaced with 3W1, 7W1. The series of changes show 6W1, 5W1, and 3W___ all in an effort to disguise visits of 10 days in a row which would cause close scrutiny. The blank is an example of how the Defendants manipulated frequency and duration of Aide visits determining them after the fact in line with the longest duration assigned to a skilled discipline.  This chart further includes a Physician Plan of Treatment Change and Additional Orders form which shows that an "order" is in the chart for 1W4 for LCSW to see patient but does not state what is to be done for patient by LCSW and states that the "order" is on the "verbal approval" given by Lydia who is a nurse supervisor in Defendants's office. The form is signed by the LCSW requesting the order and is not signed by a physician. Furthermore, the actual treatment provided by the LCSW was for counseling which Defendants' knew was a type of service for which coverage would be denied.

136.   One example of an incident about which Relator has personal knowledge of an abuse or

wrongdoing by Defendants is: Upon review of the following patient's chart Relator observed the following and reported same to Defendants. The patient was Albert Shreiar (MR ID # 5058-1). The Patient Choice Form in the chart is dated for the patient by the RN witnessing the document and not by the patient attesting thereto. Due to lack of staffing, nurses do visit on day one of start of care and fill out admission paperwork on the next day or during the skilled care visit due to time required for proper admission by Defendants. Here, the number one RN did not obtain original physician order and no order for care provided day two. "Order" was then written on day 2 by RN from day one to "cover" all visits. DCO and supervisory nurse directed that order be destroyed and replaced by the day one nurses' order which had not really been obtained on day one and did not really cover the visit on day one. The records demonstrate that Defendants engaged in destroying patient chart records and replacing them with falsely created documents to cover mistakes and attempt to present a paper trail that appears to be in line with regulations.

137.   One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is: Upon review of the following patient's chart Relator observed the following and reported same to Defendants. The patient's name is Etta Delvin (MR ID # 5055-1). The chart documents indicate in the referral documents that the start of care date is 4-10-98 and also 4-11-98. The intake date shows 4-11-98 and is written over as 4-12-98. The 485 worksheet shows a start of care date of 4-12-98 and other admit documents show 4-12-98. The consent form is dated 4-11-98. The intake form shows skilled nurse visits 3w2, however, given that a Medicare week is Monday through Sunday, and given that 4-11-98 was a Saturday there could not be visits of 3w2 that week. Further, the paperwork shows that the

Aide visit frequency was listed as 3w____.  This would later be filled in to coincide with the longest duration of whichever discipline saw the patient the longest.  Thus these documents themselves reflect that the determinations made regarding this patient's care had no real relationship to the patient's needs.

138.    One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:  Upon review of the following patient's chart Relator observed the following and reported same to Defendants. The patient was Bernice Schimmel (MR ID # 4217-1).  The PT evaluation of this patient reveals that the patient has a "busy social calendar" and refuses PT at home.  In light of this information from PT the case conference notes by skilled nurse for Defendants dated 10-3-97 and 10-4-97 as to homebound status and how patient needs are met appear inappropriate and highly suspect.

139.    One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:  Upon review of the following patient's chart Relator observed the following and reported same to Defendants.  The patient is George Cummings (MR ID # 14595-2).  The start of care date is shown as 9-1-98 in the patient's chart.  Relator observed that the handling of this case appeared to be the routine manner in which Defendants acted.  The original "order" of 9-1-98 was  written by skilled nurse doing admit visit at patient's home. The nurse supervisor in Defendants' offices then added information to the "orders" which purported to be information from the 9-1-98 visit but in fact was information which came at later dates from different sources namely, the PT eval note on 9-2-98 and the ST eval note on 9-2-98. The original nurse wrote order for Aide visits as ____ duration which the supervisory nurse later filled in, in accordance with the ST duration as that was the longest

50

duration of any discipline.  No treatment was specified in the "orders" for the disciplines which serviced this patient.

140.&#x20;&#x20;&#x20;One example of an incident about which Relator has personal knowledge of an abuse or wrongdoing by Defendants is:  Upon review of the following patient's chart Relator observed the following and reported same to Defendants.  The patient's name is Doris Prottas (MR ID # 11992-1).  The certification period was 10-8-98 to 12-8-98.  Defendants' Special Case Referral Form dated 11-4-98 states " Daily visits are not reasonable and/or necessary. SN who did SOC acknowledged that daily visits were not justified".  Nurse's note, Jackie Zinberg, to Defendants' QA department states that "at Start of Care I told Significant Other of Patient that Patient did not need daily care.  Significant other called the patient's doctor and complained that he wants daily care. MD called us (Defendants) and said 'I want you to go daily'.  PCC (nursing Supervisor, Francis Verner) said 'go daily'. Any suggestions?".  Defendants QA responded to Nurse that they agreed with her and did not even know how the case could be properly coded. Chart shows that patient was given daily care and demonstrates that such daily care was not needed nor justified.  Relator understood from Defendants that in such instances the doctor was to be appeased.

141.&#x20;&#x20;&#x20;At all times material hereto, the Defendants knew, or were grossly negligent or reckless in not knowing, that Defendants were making or causing to be made false statements or representations in making claims for reimbursement or applications for payment under the Medicare program and in committing numerous instances of irregularities which were in violation of Federal and State guidelines and Tenet's Policies and Procedures and applicable Medicare standards.

51

142.    Upon information and belief, Defendants knowingly, as that term is defined by 31 U.S.C. §

3729(b), filed, or caused to be filed, with the Federal Government applications for the

payment of United States' Government funds, and upon information and belief, caused

moneys of the United States Government to be paid, to themselves when the circumstances

rendered such claims fraudulent and illegal.

## FIRST CLAIM
(Violation of 31 U.S.C. § 3729(a)(1))

143.    The Relator repeats the allegations of paragraphs 1-142 contained herein.

144.    Upon information and belief, Defendants presented, or caused to be filed, with the United

States Government claims with knowledge of their falsity, or with grossly negligent or

reckless disregard to facts and conditions that would indicate that said claims were inaccurate

or inappropriate and false and caused payments for said claims to be made by the United

States Government.

145.    By reason of the violation of 31 U.S.C. § 3729(a)(1) Defendants have knowingly or recklessly

damaged the United States Government in an as yet undetermined amount

## SECOND CLAIM
(Violation of 31 U.S.C. § 3729(a)(2))

146.    The Relator repeats the allegations of paragraphs 1-142 contained herein.

147.    Upon information and belief, Defendants presented, or caused to be filed, with the United

States Government claims with knowledge of their falsity, or with grossly negligent or

reckless disregard to facts and conditions that would indicate that said claims were inaccurate

or inappropriate and false and caused payments for said claims to be made by the United

States Government.

148.   By reason of the violation of 31 U.S.C. § 3729(a)(2) Defendants have knowingly or recklessly damaged the United States Government in an as yet undetermined amount.

THIRD CLAIM
(Violation of 31 U.S.C. § 3729(a)(3))

149.   The Relator repeats the allegations of paragraphs 1-142 contained herein.

150.   The Defendants in performing the acts hereinbefore set forth, conspired to defraud the United States Government in violation of 31 U.S.C. § 3729(a)(3) by getting false or fraudulent claims allowed or paid to the damage of the United States' Government.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, United States ex rel. Randy S. Schwartz individually pray that judgment be entered against the Defendants, Tenet Healthcare Corporation, Tenet Home Care of Delray Medical Center, and Tenet South Florida HealthSystem, each of them jointly and severally:

A.  In an amount, presently indeterminable, upon the First, Second, and Third Claims, for violation of 31 U.S.C. § 3729(a)(1), (2) and (3) sum duly trebled in addition to a fine of not less than $5,000 per violation and not more than $10,000, together with attorneys' fees and costs;

B.  In addition, plaintiffs pray for such further and additional relief at law or in equity that this Court may deem appropriate or proper.

53

PLAINTIFFS, UNITED STATES ex rel. RANDY S. SCHWARTZ INDIVIDUALLY,

DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

Robert Anthony Bogdan
Florida Bar No. 0040606
Attorney at Law
410 S.E. 1st Terrace
Pompano Beach, FL 33060-7108
Tel.    (954) 784-9788
Fax    (954) 784-9528
Counsel for Plaintiffs

54

# CIVIL COVER SHEET

CIV - GOLD

99-6668

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

UNITED STATES OF AMERICA, ex. rel. RANDY S. SCHWARTZ

**DEFENDANTS**

TENET HEALTHCARE CORPORATION, TENET HOME CARE OF DELRAY MEDICAL CENTER, and TENET SOUTH FLORIDA HEALTHSYSTEM

MAGISTRATE JUDGE SIMONTON

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT BROWARD
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

ROBERT ANTHONY BOGDAN, 410 SE 1 TER, POMPANO BEACH, FL 33060-7108   (954) 784-9788

ATTORNEYS (IF KNOWN)

**(d) CIRCLE COUNTY WHERE ACTION AROSE:**
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN X ONE BOX ONLY)

- ☒ 1. U.S. Government Plaintiff
- ☐ 2. U.S. Government Defendant
- ☐ 3. Federal Question (U.S. Government Not a Party)
- ☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (For Diversity Case Only)
(PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

False Claims Act, 31 U.S.C. Sections 3729-3733.

**IVa.** 20 days estimated (for both sides) to try entire case

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| A CONTRACT | A TORTS | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUS |
|---|---|---|---|---|
| ☐ 110 Insurance | | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 States Reapportionment |
| ☐ 120 Marine | **PERSONAL INJURY** | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 310 Airplane | ☐ 362 Personal Injury-Med Malpractice | | |
| ☐ 140 Negotiable Instrument | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **A PROPERTY RIGHTS** |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights |
| ☐ 161 Medicare Act | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 830 Patent |
| ☐ 162 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs | ☐ 840 Trademark |
| ☐ 163 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending B | ☐ 660 Occupational Safety/Health | **B SOCIAL SECURITY** |
| ☐ 160 Stockholder's Suits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 861 HIA (1395ff) |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **A LABOR** | ☐ 862 Black Lung (923) |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **B PRISONER PETITIONS** | ☐ 720 Labor/Management Relations B | ☐ 864 SSID Title XVI |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Management Reporting & Disclosure Act | ☐ 865 RSI (405(g)) |
| ☐ 220 Foreclosure B | ☐ 442 Employment | | ☐ 740 Railway Labor Act | **A FEDERAL TAX SUITS** |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General * | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Employee Ret. Inc. Security Act B | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other * | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights * A or B | | |

Other Status additional entries:
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc. B
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12USC3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☒ 890 Other Statutory Actions * A or B

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

- ☒ 1. Original Proceeding
- ☐ 2. Removed From State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Refiled
- ☐ 5. Transferred from another district (Specify)
- ☐ 6. Multidistrict Litigation
- ☐ 7. Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT**

CHECK IF THIS IS A ☐ UNDER F.R.C.P. 23 CLASS ACTION   DEMAND $   Check YES only if demanded in complaint
JURY DEMAND: ☒ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See Instructions):

JUDGE _____   DOCKET NUMBER _____

DATE 5-28-99

SIGNATURE OF ATTORNEY OF RECORD _[signature]_

UNITED STATES DISTRICT COURT
S/F I-2
REV. 9/94

FOR OFFICE USE ONLY: Receipt No. 516380
Date Paid: 5/28/99
Amount: 155.00
M/ifp: _____